☑ Original    ❑ Duplicate



CLERK'S OFFICE
A TRUE COPY
Feb 02, 2026
/s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 26-MJ-2 |
| 74 Harvest Drive, Apartment 7307, Fond du Lac, Wisconsin | ) |
| 54937, Black Chevrolet Traverse bearing New Jersey license | ) |
| plate G54-VSX and the person of Heath DILLENBECK | ) |
| (DOB: XX/XX/2000), as more fully described on Attachment A | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ 02/16/2026 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ❑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Honorable William E. Duffin _____ .

*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❑ for _____ days *(not to exceed 30)*    ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:    02/02/2026 at 4:05 p.m.        *William E. Duffin*

*Judge's signature*

City and state:    Milwaukee, WI                Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

<u>**Attachment A**</u>
<u>**Property to be Searched**</u>

This warrant applies to the apartment residence located at 74 Harvest Drive, Apartment 7307, Fond du Lac, Wisconsin 54937 (the **"Subject Premises"**). The **Subject Premises** is located inside a multi-unit building bearing a sign that reads "74 Harvest Dr." The building has tan siding and brown brick façade. The building has multiple common doors. To the left of the common door leading to apartment 7307, there is a sign containing the numbers 7307, 7308, 7207, 7208, 7107, and 7108. The apartment door bears a number plate reading "7307" above a peep hole. This warrant also applies to a black Chevrolet Traverse bearing New Jersey license plate G54-VSX (the **"Subject Vehicle"**) and the person of Heath DILLENBECK, date of birth 05/03/2000. Pictures of the **Subject Premises** and **Subject Vehicle** are attached below.









# Attachment B
## Particular Things to be Seized

Evidence of a crime, instrumentalities, and contraband concerning production of child pornography in violation of 18 U.S.C. § 2251, and possession and receipt of child pornography offenses in violation of 18 U.S.C. §§ 2252 and 2252A (the "**Subject Offenses**") as follows:

1.      Documents in any format and medium pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8).

2.      Computers, tablets, removable media, electronic gaming devices, media players, computer hardware, computer software, and video display monitors that, based on their location, appearance, and/or other information learned at the time of the execution of the warrant are reasonably believed to be connected to the **Subject Offenses** or are in the possession of, used, or accessible by Heath DILLENBECK. This includes, but is not limited to, materials used to: visually depict child pornography as defined in 18 U.S.C. § 2256(8); display or access information pertaining to child pornography; display or access information pertaining to sexual activity with children; communicate with children; or advertise, distribute, possess, or receive child pornography, or otherwise access to transmit information pertaining to child pornography or other sexual activity with children.

3.      Phones that, based on their location, appearance, and/or other information learned at the time of the execution of the warrant are reasonably believed to be connected to the **Subject Offenses** or are in the possession of or used, currently or previously, by Heath DILLENBECK.

4.      Any passwords, encryption keys, and other devices that may be necessary to access any electronic equipment described above.

5.      Any items demonstrating the presence or absence of computer software that would allow others to control any electronic equipment, and the presence or absence of security software designed to detect such malicious software.

6.      Any items demonstrating the attachment of other computer hardware or storage media.

7.      Any counter-forensic programs and associated data that are designed to conceal or eliminate data.

8.      Any computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

9.      Items in any format and medium containing names, addresses, and/or other contact information of individuals who may have been contacted by individual(s) located at the **Subject Premises** (described in Attachment A) by use of the computer or by other means concerning the use of minors to engage in illegal sexual activity and the possession, receipt, or distribution child pornography, as defined in 18 U.S.C. § 2256(8).

10.     Any items in any format or medium of child pornography as defined in 18 U.S.C. § 2256(8); visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or of child erotica; of items pertaining to the enticement of minors to engage in illegal sexual activity; or of items evincing the **Subject Offenses** or otherwise relating to the sexual exploitation or abuse of children.

11.     Any items identifying persons transmitting child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

12.     Any items concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

13.     Any items concerning membership in online groups, clubs, or services that make accessible child pornography to members.

14.     Any items that concern any accounts with Internet Service Providers, including but not limited to sales receipts, bills, and notes.

15.     Documents, in any format or medium, pertaining to occupancy of the **Subject Premises**, such as utility and telephone bills, mail envelopes, or addressed correspondence.

16.     Any items in any format or medium of child pornography as defined in 18 U.S.C. § 2256(8), or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or of child erotica, or of items evincing the **Subject Offenses** or otherwise relating to the sexual exploitation or abuse of children.

17.     Items in the above paragraphs that are stored in computer media, including media capable of being read by a computer (such as external and internal hard drives, memory sticks and thumb drives), and electronic devices such as computers, cellular phones, tablets, video display monitors, and other devices capable of storing digital images or accessing the internet, shall be searched.  In executing this search warrant, law enforcement will seize computer media and electronic devices that, based on their location, appearance, and/or other information learned at the

time of the execution of the warrant, are reasonably believed by law enforcement to belong to or have been used by Heath DILLENBECK, or to otherwise be linked to the **Subject Offenses**.

During the execution of the search of the **Subject Premises** described in Attachment A, law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of Heath DILLENBECK to the fingerprint scanner of the device; or (2) hold a device found at the premises in front of the face of Heath DILLENBECK and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

CLERK'S OFFICE
A TRUE COPY
Feb 02, 2026
/s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.   26-MJ-2 |
| 74 Harvest Drive, Apartment 7307, Fond du Lac, Wisconsin 54937, Black | ) |
| Chevrolet Traverse bearing New Jersey license plate G54-VSX and the | ) |
| person of Heath DILLENBECK (DOB:  xx/xx/2000), as more fully | ) |
| described on Attachment A | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) | Production of child pornography |
| 18 U.S.C. § 2251(a)(2) | Receipt of child pornography |
| 18 U.S.C. § 2252(a)(4)(B) | Possession of child pornography |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Hannah Judd, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:  02/02/2026

_____
*Judge's signature*

City and state:  Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Hannah Judd, being first duly sworn, depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1. I make this affidavit in support of an application for a search warrant for the apartment residence located at 74 Harvest Drive, Apartment 7307, Fond du Lac, Wisconsin 54937 (the "**Subject Premises**"), a black Chevrolet Traverse bearing New Jersey license plate G54-VSX (the **"Subject Vehicle"**), and the person of Heath DILLENBECK, described further in Attachment A, for evidence of a crime, instrumentalities, and contraband described further in Attachment B, concerning production of child pornography, in violation of Title 18, United States Code, Section 2251(a), receipt of child pornography in violation of Title 18, United States Code, Section 2252(a)(2), and possession of child pornography in violation of Title 18, United States Code, Section 2252(a)(4)(B) (the "**Subject Offenses**").

2. I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI) since June 2022 and am currently assigned to the Milwaukee Division as a member of the Milwaukee Child Exploitation and Human Trafficking Task Force. Prior to becoming a Special Agent, I was employed by the FBI since 2014 in support positions. As part of my duties as an FBI Special Agent, I investigate federal criminal violations relating to the sexual exploitation of children, including violations related to possession, receipt, and distribution of child pornography, travel with intent to engage in illicit sexual conduct, and coercion and enticement, in violation of Title 18 U.S.C. §§ 2251, 2251(a), 2252, 2252A, 2423(b), and 2422. Throughout my employment with the FBI, I have participated in numerous criminal investigations, many of which involved the use of the Internet, email, and other social media, to further criminal activity. I have received

training relating to internet crimes against children investigations in which computers and other digital media are used as a means to commit criminal violations related to child exploitation and the production and possession of child pornography. I have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media. As a result of my training, experience, and discussions with other law enforcement officers assigned to investigate child pornography and the sexual exploitation of children, I am familiar with methods by which electronic devices are used as the means for receiving, transmitting, possessing, and distributing images and videos depicting minors engaged in sexually explicit conduct. I have participated in the execution of federal search warrants of physical premises, digital devices, and online accounts, including social media applications.

3. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and information provided to me by other law enforcement personnel or persons with knowledge with relevant facts.

4. This affidavit contains summaries of certain mobile messaging conversations. The summaries do not necessarily refer to all of the topics discussed during the conversations, and the summaries do not include every statement made by every speaker on the topics described. With respect to the electronic communications summarized herein, I have reviewed actual chats and media files contained therein from a cell phone for one of the two parties to the conversation or from the mobile messaging company records.

5. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that

2

evidence, instrumentalities, and contraband relating to violations of the **Subject Offenses** are located in the **Subject Premises, Subject Vehicle,** and/or on the person of DILLENBECK.

## DEFINITIONS

6.     The following definitions apply to the Affidavit and Attachments to this Affidavit:

a.     "Cellular telephone" or "cell phone" means a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may include geolocation information indicating where the cell phone was at particular times.

b.     "Child Pornography" is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the

3

visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.      "Computer" is defined in 18 U.S.C § 2256(6) and 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

d.      "Computer hardware" means all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

e.      "Computer software" is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

f.      "Computer-related documentation" consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

4

g.     "Passwords" consist of information or items designed to restrict access to or hide computer software, documentation, or data.  A password or pass phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.

h.     "Electronic storage media" includes computers, cellular telephones, tablets, and devices designed specifically to store electronic information (e.g., external hard drives and USB "thumb drives").  Many of these devices also permit users to communicate electronic information through the internet or through the cellular telephone network (e.g., computers, cellular telephones, and tablet devices such as an iPad).

i.     The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j.     "Internet Service Providers" (ISPs) are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail

5

mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

k.     An Internet Protocol address ("IP address") is a unique numeric address used by Internet-enabled electronic storage devices to access the Internet. An IP address is either a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178) or a series of eight groups of four hexadecimal digits each separated by colons (e.g. 2001:0000:9d38:6ab8:1c48:3a1c:a95a:b1c2). Every electronic storage device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that electronic storage device may be directed properly from its source to its destination. Most ISPs control a range of IP addresses. Some computers have static, that is, long-term IP addresses, while other computers have dynamic that is, frequently-changed IP addresses.

l.     "Minor" means any person under the age of eighteen years. 18 U.S.C. § 2256(1).

m.     The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including writings and drawings), photographic form (including prints, negatives, videotapes, motion pictures, and photocopies), mechanical form (including printing and typing) or electrical, electronic or magnetic form (including tape recordings, compact discs, electronic or magnetic storage devices such as hard disks, CD-ROMs, digital video disks

6

(DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

n.     "Sexually explicit conduct" means actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, the genitals, or pubic area of any person.  18 U.S.C. § 2256(2).

o.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.  18 U.S.C. § 2256(5).

## FACTS SUPPORTING PROBABLE CAUSE

**A.  INITIAL INVESTIGATION**

7.     Jacksonville, North Carolina Police Department (JPD) requested the assistance of FBI Charlotte – Wilmington Resident Agency after a 14-year-old minor female, hereafter Minor A[1],  was missing from her residence. Minor A was later located with an adult male. Minor A's cell phone was located in the grass outside of her residence and provided to JPD by Minor A's mother.

_____

[1] Minor A's full identity and Snapchat username are known to the FBI. References to Minor A and messages or media files sent from Minor A's Snapchat account are referred to only as "Minor A" for privacy purposes.

7

Minor A's mother provided consent to search the device on or about May 20, 2025. Law enforcement forensically acquired the data from the cell phone. Law enforcement personnel observed sexual communications between Minor A and several unknown individuals on applications including Snapchat[2]. JPD also obtained a State of North Carolina search warrant for Minor A's cell phone on approximately May 22, 2025. One of the individuals observed to be in communication with Minor A was Snapchat user jimmymy6969, the Subject Account.

8.    Metadata about the chat thread recovered within the cell phone data indicated messages between Minor A and the Subject Account occurred between approximately April 29, 2025[3] and May 20, 2025. Based upon the information recovered from Minor A's cell phone, the exact date Minor A and the Subject Account began interacting is unknown.

9.    On May 19, 2025, Minor A said "I'm hornyyy" to which the Subject Account replied "Mmmm show me." Minor A sent an approximately 3 second video depicting Minor A wearing a t-shirt and black spandex shorts rubbing herself between her legs on top of her shorts. The Subject Account replied "Mmm baby good girl keep going." Minor A sent another video depicting the same conduct and the Subject Account replied "Fuck baby you gonna moan for me." A short time later the Subject Account said "I wanna hear that moannn" and "Pleaseeeee." Minor

---

[2] Snapchat is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos. Snapchat, provided by Snap, Inc., is a messaging application for mobile phones with Apple's iOS operating system and Google's Android operating system. Snapchat can also be accessed through a web browser.

[3] As provided to FBI Milwaukee, the data obtained from Minor A's cell phone was in Coordinated Universal Time (UTC). The Eastern District of Wisconsin is located in Central Time Zone, which is 5 hours or 6 hours behind UTC depending on the time of the year. For consistency, any date referenced is based on the UTC timestamp presented in the data.

A sent an approximately 6 second video depicting Minor A touching her bare genitalia with her fingers. The Subject Account said "Mmmmm fuckkk good girl omg."

10.     The Subject Account continued the conversation and said "Fuck Faster." Minor A sent an approximately 10 second video that depicted her touching her bare genitalia. The perspective of the video moved to a close-up view of her genitalia during the course of the video. The Subject Account said "Fuckkkk babyyy omggg stick those fingers in." Minor A sent another video that depicted herself fully nude inserting an object into her vagina. The Subject Account replied with a voice message that included what sounded like a male voice saying "holy fuck god damn more please." Minor A sent several additional videos depicting similar sexual conduct. The Subject Account responded with another voice message that included what sounded like the same male voice saying in part "oh my god don't stop fuck I want that cream all over my goddamn cock […]."

11.     After more videos and messages, the Subject Account sent another voice message that sounded like the same male voice saying "Fuck damn so the real question is how good do you taste." Minor A responded "Good most likely, especially since when I squirt it smells sweet." The Subject Account responded with a voice message that sounded like the same male voice saying "well shit fucking show me please god damn." After which, Minor A sent additional videos depicting similar sexual conduct as previously described followed by a message that said "Wish you were here to taste it."

12.     The Subject Account sent a voice message that sounded like the same male voice saying "But I wanna see you taste yourself." Minor A sent a video depicting similar sexual conduct as previously described and then sent a video that showed a close-up of Minor A's genitalia with

9

a white substance on it observed previously coming out of her vagina. Minor A wiped the substance with her finger and then placed her finger on her tongue and in her mouth while looking at the camera. The Subject Account responded with a voice message telling Minor A she was a good girl.

13.     Minor A sent a message that said "Mmm I need you" to which the Subject Account replied with a voice message that sounded like the same male voice saying "Mmm how badly do you need me baby tell me how bad." Minor A replied with a video of herself inserting an object into her vagina and saying what sounded like "I need you so bad."

14.     The Subject Account sent a voice message that sounded like the same male voice saying "oh baby fuck you are gonna feel so amazing." Minor A replied "Mmm yes I am baby" to which the Subject Account sent another voice message of what sounded the same male voice saying, "I cannot wait to fucking pound you."

15.     Later in the conversation, the Subject Account said "LEMME POUND YOU" and Minor A replied "I wouldddd." The Subject Account asked "Ughhhh whennnn." Minor A said she did not know and also "Sorry luv you know I've got restrictions." The Subject Account asked "Such as?" and Minor A replied "My family" and "They won't let me go anywhere." The Subject Account asked "Not even with your friends?" and Minor A replied "Nope."

16.      Based on my training and experience, several instances of the above described and referenced videos depicted child pornography of an identified minor, namely Minor A who was 14 years old during the conversation, at least some of which appeared to have been created in response to requests from the Subject Account.

10

17.     During a forensic interview on or about August 1, 2025, Minor A disclosed that she utilized an application called Qudo, which according to Minor A was linked to Snapchat. Minor A indicated that Qudo was used for "adding people" on Snapchat. Minor A stated she told people she was over 18 years old on Qudo. A subsequent review of Minor A's cell phone conducted by FBI Charlotte – Wilmington Resident Agency personnel revealed several conversations wherein Minor A provided an age less than 18 to Snapchat users believed to be adults. Minor A also provided information about herself like playing sports at school, attending school, references to her mom. However, based upon this review, an age discussion was not always present in the interaction, such as that with the Subject Account.

18.     Based on my training and experience, I know that conversations discussing the age of participants often occur at the beginning of an online relationship. As referenced above, no statements indicative of the beginning of a relationship were observed in the interaction between Minor A and the Subject Account. I also know that minors will occasionally provide information indicative of being underage, such as attending school, participating in sports, or references to parents or family members, later on in conversations sometimes after an initial conversation of specific age. Similarly, I know that it is common for minors to have curfews or other restrictions on what they can and cannot do or who they can or cannot be with, similar to the implication by Minor A detailed in paragraph 15.

19.     FBI Charlotte – Wilmington Resident Agency issued an FBI administrative subpoena for subscriber information for the Subject Account to Snap Inc from approximately August 14, 2023 to August 15, 2025.

20.     Pursuant to the same FBI administrative subpoena, Snap Inc. advised the phone number XXX-XXX-9752[4] was associated to the Subject Account on September 1, 2023 and removed later on the same day.

21.     According to a publicly available database, XXX-XXX-9752 was associated to Heath Dillenbeck, date of birth XX/XX/2000. The same database provided Heath Dillenbeck's most recent address as 74 Harvest Drive, Apartment 7307, Fond du Lac, Wisconsin, the **Subject Premises**.

22.     Pursuant to an FBI administrative subpoena, Verizon Wireless advised the subscriber for the phone number XXX-XXX-9752 was James Dillenbeck[5] with an address in Walworth, WI.

23.     Based upon this information, FBI Charlotte – Wilmington Resident Agency transferred the investigation to FBI Milwaukee for further investigation.

**B.  Snapchat Search Warrant Results**

24.     Based upon the above information, United States Magistrate Judge William Duffin, Eastern District of Wisconsin, authorized a search warrant to Snap Inc. for information and records related to the Snapchat Account jimmymy6969 on December 16, 2025. The search warrant authorized the search for evidence, instrumentalities, and contraband related to the **Subject**

---

[4] The entire phone number is known to the FBI, but redacted here for privacy purposes.

[5] According to a profile page on the Ripon College athletics website for Heath Dillenbeck, located later by FBI Milwaukee, James Dillenbeck is Heath Dillenbeck's father.

12

**Offenses** from April 1, 2025 through the date of signature. Snap Inc. provided the requested records and information on or about December 26, 2025.

25.     Within the search warrant return approximately 115 media files were located that were sent between Minor A and the Subject Account. Some of the media files appeared to be the same as those described above that were located on Minor A's cell phone that depicted Minor A engaged in sexually explicit conduct. The media files sent from Minor A to the subject were noted by Snap Inc. as saved by the Subject Account. No text-based messages between Minor A and the Subject Account were observed within the search warrant records.

26.     Within the search warrant return, approximately 850 messages were observed between the Snapchat Account and aXXXXXXXXX[6] ("Snapchat User 2"). Similar to the data recovered between Minor A and the Subject Account, no text-based messages were observed. On May 20, 2025, the Subject Account sent a picture of an erect penis with the following words overlaid, "Do you want daddy's big dick to stretch that underage wet pussy??" Snapchat User 2 sent three videos of a female inserting her fingers into her vagina. At the same time as these videos, a picture file with the words "yes daddy, i need your dick to stretch out my underage virgin pussy." Based upon my experience and knowledge of Snapchat, I believe these words were likely laid on top of the video when sent. The Subject Account responded with another picture of an erect penis with the words "Thats what daddy needs to hear." Snapchat User 2 send a close-up picture of female genitalia being spread with fingers and the words "mmm is it daddy?" Snapchat User 2 sent additional close-up videos of a female touching her genitalia. In one of these videos, the

---

[6] The username for Snapchat User 2 is known to the FBI, but redacted here as it may belong to a potential or suspected minor.

female can be heard saying in part "I want your dick in my underage virgin pussy daddy please." After several more sexually explicit videos from Snapchat User 2, the Subject Account sent a video of a male ejaculating.

27.     On June 4, 2025, the Subject Account sent a video of a male masturbating. At the same time a picture with the words "Can daddy see more??" was sent to Snapchat User 2. As previously noted, I believe these words were overlaid on the video. Snapchat User 2 responded with a picture of what appeared to be buttocks and the word "likeeee?" overlaid. The Subject Account responded with another masturbation video during which a male voice can be heard saying "I would love to see that pussy baby." Snapchat User 2 then sent a close up picture of what appeared to be a female pubic area covered with underwear and the words "hmmm this?" overlaid. During another masturbation video sent by the Subject Account, a male said "Fuck yes oh my god." Snapchat User 2 then sent a close-up picture of female genitalia being spread open with fingers.

28.     On July 1, 2025, the Subject Account received a video from CXXXXXXXXXXXX[7] ("Snapchat User 3") that was approximately 38 seconds in length. The video depicted what appeared to be a prepubescent female, (approximately 8 to 11 years old), based lack of breast development and pubic hair nude, kneeling in front of a camera. The girl touched her genitalia with her fingers and inserted a hairbrush into her vagina. The message from Snapchat User 3 contained two additional videos that appeared to depict minor females engaged

---

[7]The full username for Snapchat User 3 is known to the FBI and believed to be another user distributing child pornography.

14

in sexually explicit conduct. The records provided by Snap Inc. indicated the Subject Account saved this message.

29.     Approximately 33 conversations were observed where the Snapchat user whom the Subject Account was communicating with provided an age. Of these 33 conversations, approximately 16 Snapchat users advised the Subject Account they were 17 years old or younger.

### C.  Additional Information Associating Dillenbeck to the Subject Account and Subject Premises

30.     Within the results from the FBI administrative subpoena described in paragraph 19 for the Subject Account, one of the most frequently observed IP addresses, particularly between approximately April 18, 2025 and June 6, 2025, was 72.131.82.67, which was assigned to the internet service provider Charter Communications. Pursuant to an FBI administrative subpoena, Charter Communications advised the following account was assigned the IP address 72.131.82.67 between April 18, 2025 at 4:43AM and June 7, 2025 at 5:22PM:

Subscriber Name: Heath Dillenbeck

Service Address: 6935 70th Ct, Unit 112, Kenosha, WI 53142

Billing Address: 74 Harvest Dr, Apt 7307, Fond du Lac, WI 54937 (**Subject Premises**)

User Name or Features: hdillenbeck398@gmail.com

Phone Number: XXX-XXX-9752[8]

---

[8] The entire phone number is known to the FBI, but redacted here for privacy purposes. The phone number provided by Charter was the same phone number previously associated to the Subject Account as detailed in paragraph 20.

15

31.     Pursuant to the search warrant detailed in paragraph 24, Snap Inc. provided IP addresses utilized to access the Subject Account between April 1, 2025 and December 16, 2025. The IP address 99.105.12.51 was the most frequently observed IP address during that time period. Pursuant to an FBI administrative subpoena, AT&T advised the following account was assigned the IP address 99.105.12.51 between July 4, 2025 2:23AM UTC and December 16, 2025 7:22 PM UTC:

Subscriber Name: Heath Dillenbeck

Service Address: 74 Harvest Drive Unit 7307, Fond du Lac, WI 54937-2335 (**Subject Premises**)

Contact Phone: XXX-XXX-9752[9]

32.     Within the results from the FBI administrative subpoena described in paragraph 19 for the Subject Account, several IP addresses and corresponding port numbers were observed accessing the account that resolved to Verizon Wireless. Pursuant to an FBI administrative subpoena, Verizon Wireless advised XXX-XXX-9752[10] was assigned the given IP addresses: 174.253.109.198 Port 2744 on August 14, 2025 at 18:42:23UTC; 174.224.252.191 Port 2773 on August 14, 2025 at 12:53:33UTC; 174.253.103.209 Port 2112 on August 13, 2025 at 16:53:37UTC; 174.253.97.156 Port 2080 on August 13, 2025 at 12:34:04UTC; 174.224.243.91 Port 7094 on August 12, 2025 at 19:02:55UTC.

---

[9] The entire phone number is known to the FBI, but redacted here for privacy purposes. The phone number provided by AT&T was the same phone number previously associated to the Subject Account as detailed in paragraph 20.

[10] The entire phone number is known to the FBI, but redacted here for privacy purposes. The phone number provided by Verizon was the same phone number previously associated to the Subject Account as detailed in paragraph 20.

33.     Pursuant to the same administrative subpoena, Verizon Wireless advised XXX-XXX-9752 was assigned to a Samsung "Galaxy S23 Plus 256 BLK" with IMEI 351219580062124.

34.     According to records received from the search warrant, the Subject Account was accessed using an Android device with model number SM-S916U, which according to publicly available websites is a Galaxy S23+, the same model provided by Verizon in the subpoena response.

35.     Snap Inc. also provided geo-location information for the user of the Subject Account in response to the search warrant. The user was frequently observed in the area of the **Subject Premises**.

36.     Within the search warrant return, the Subject Account sent selfie-style pictures (an example of which is seen to the right below) that appeared visually similar to the Wisconsin Department of Motor Vehicles driver's license picture for Dillenbeck (as seen to the left below).

 

17

37.     Similarly, FBI personnel conducted surveillance in the location of the **Subject Premises** on January 13, 2026 and January 22, 2026. A male matching the physical description and appearing visually similar to the driver's license picture of Dillenbeck was observed exiting the common door at the apartment building that leads to the **Subject Premises** and 5 other units. The male then operated a black Chevrolet Traverse, bearing New Jersey license plate G54-VSX, the **Subject Vehicle**. According to vehicle registration information, this vehicle is leased to Swedish Match, Inc. North America.

38.     A LinkedIn page for Dillenbeck was located that listed Swedish Match as an employer. Similarly, a Facebook page for Dillenbeck also listed Swedish Match as his employer. On January 22, 2026, the male observed exiting the apartment building and entering the Traverse wore a backpack with the words "Swedish Match" embroidered on it.

39.     On January 13, 2026, available wi-fi networks were observed from outside of the apartment building. One of the networks observed was titled "The Dillenbecks," which was secured with a password as denoted by having a "lock" depicted next to the title of the network.

40.     A query of a publicly available database for the **Subject Premises** revealed a female adult[11] was also associated to the address and appeared to share prior common addresses with DILLENBECK. According to DILLENBECK's Facebook profile, he is engaged to this female. Both Dillenbeck and the female posted pictures of a baby in 2025.

41.     Based upon the above information, the Subject Account is believed to be utilized by Heath DILLENBECK, who resides at the **Subject Premises** and operates the **Subject Vehicle.**

---

[11] The adult female's identity is known to the FBI.

## BACKGROUND ON CHILD EXPLOITATION OFFENDERS

42.     Based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers affect the methods used by people who possess, receive, distribute, and transport child pornography in these ways.

43.     Those who create child pornography can produce both still and moving images directly from a common video or digital camera, and other devices that create video and still images, including most cellular telephones. Images from such devices can be transferred to a computer by attaching the device to the computer using a cable, or by uploading images from the device's memory card directly onto the computer or into a storage account accessible from any computer with the capability of accessing the internet (sometimes referred to as a "cloud" account). Once on the computer, images can then be stored, manipulated, transferred, or printed. This includes transfer to some of the same types of devices that are commonly used to create child pornography, such as cellular telephones, as well as other computers. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography.

44.     The Internet allows any computer to connect to another computer. Electronic contact can be made to millions of computers around the world. The Internet allows users, while still maintaining anonymity, to locate (i) other individuals with similar interests in child pornography; and (ii) websites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. They can also distribute and collect child pornography with peer-to-peer ("P2P")

19

file sharing, which uses software to link computers together through the Internet to form a network that allows for the sharing of digital files among users on the network, or through online social media or messaging applications, such as Snapchat. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet.

45.     The computer's capability to store images in digital form makes it a common repository for child pornography. Internal and external computer hard drives typically store vast amounts of data, and hard drives with the capacity of 500 or more gigabytes – which can store tens of thousands of images at very high resolution – are not uncommon. Other electronic storage media, such as thumb drives and memory sticks, can store hundreds of images and dozens of videos. Likewise, optical storage media, which includes CD-ROMs and DVDs, and electromagnetic storage media, such as floppy disks and SD-cards, also can hold hundreds of images and multiple videos. Such electronic, optical, and electromagnetic storage media are very commonly used by those who collect child pornography to store images and videos depicting children engaged in sexually explicit activity. Agents who execute child pornography search warrants often find electronic, optical, and/or electromagnetic storage media containing child pornography in the same location as or near the device that was used to obtain, access, and/or store child pornography.

46.     Based on my previous investigative experience related to child pornography investigations, training I have received, and the training and experience of other law enforcement

20

officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize social networking websites and social media chatting applications in order to access with intent to view and/or produce, possess, receive, or distribute images of child pornography.

47.     Based on my previous investigative experience related to child pornography investigations, training I have received, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize social networking websites and social media chatting applications in order to access with intent to view and/or produce, possess, receive, or distribute images of child pornography.

48.     Based on my training, experience, and the background of this investigation described above, I know the following:

    a.     Individuals who demonstrate a sexual interest in minors are likely to utilize the Internet to seek out images and videos depicting children engaged in sexual activity.

    b.     These individuals are also likely to utilize the Internet to meet minors on applications (also known as "apps") such as Kik, Discord, Instagram, Snapchat, Reddit, etc., and oftentimes engage in the receipt, distribution, and production of child pornography through these apps, both with minors and with adults who have a similar sexual interest in children.  Likewise, these individuals may utilize these same apps in furtherance of meeting minors in-person for sexual activity.

    c.     Individuals who access with intent to view and/or produce, possess, receive, or distribute child pornography may receive sexual gratification, stimulation, and

21

satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

d.      Individuals who access with intent to view and/or produce, possess, receive, or distribute child pornography may collect sexually explicit or suggestive materials, in a variety of digital media and electronics, including cell phones, computers, external hard drives, and cloud-based storage services, such as iCloud, Google Drive, Dropbox, and MEGA.

e.      Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

f.      By storing child pornography digitally, users avoid the need to maintain physical copies of the contraband. As detailed above, numerous digital files can be stored on a single device.

g.      By storing child pornography on a cloud-based internet account, users avoid the need to store files on their local computer or cell phone.  However, in order to access these accounts, users must connect to the internet through a device.  The users can access these cloud accounts either via a dedicated application or an internet browser. In either case, evidence of this access will likely remain on their device.  The application may store the username and password for the account.  The users' internet browser history may store the time that the internet browser accessed the cloud service.  The computer or cell phone

22

may store cookies, a small file which stores data for a particular website such as a username. A computer or cell phone may store temporary internet files, where files such as thumbnail images are saved by the device to allow for these websites to load more quickly the next time they are visited.

h.      Likewise, individuals who access with intent to view and/or produce, possess, receive, or distribute pornography often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as on a cellular phone, computer, and surrounding area. Images and videos containing child pornography received via email or electronic correspondence may be extracted and saved to portable electronic and digital mediums such as external hard drives, thumb drives, and/or USB flash drives. These child pornography images and videos may then be deleted from an email or social media account or from a computer, but stored on such external digital devices and are often maintained for several years and are kept close by, usually at the possessor's residence including storage locations such as garages, to enable the individual to view the child pornography images, which are valued highly.

i.      Individuals who access with intent to view and/or produce, possess, receive, or distribute child pornography also may correspond with and/or meet others to share information and materials, maintain correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

23

49.     My training and experience, and the training and experience of other agents whom I have consulted, have shown the following:

a.     Individuals who possess, transport, receive, and/or distribute child pornography often collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or other images, as well as literature describing sexually explicit activity involving children. Such individuals frequently store their child pornography on multiple electronic, optical, and/or electromagnetic storage media, including not only their computer, but also on external hard drives, SD-cards, floppy disks, CD-ROMs, DVDs, memory sticks, thumb drives, cell phones, and other such media. Many of these individuals also collect child erotica, which consist of items that may not rise to the level of child pornography but which nonetheless serve a sexual purpose involving children.

b.     Individuals who possess, transport, receive, and/or distribute child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, Internet Relay Chat, newsgroups, instant messaging, and other similar interfaces.

c.     Individuals who possess, transport, receive, and/or distribute child pornography often collect, read, copy, or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These

24

contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in address books or notebooks, on computer storage devices, or merely on scraps of paper.

      d.     Individuals who possess, transport, receive, and/or distribute child pornography usually maintain their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. These individuals almost always maintain their collections in the privacy and security of their homes or other secure location such as a vehicle or garage. Similarly, these individuals often retain and store devices no longer in active use in their homes or other secure locations, such as the garage. These individuals may keep their collections in locked containers including filing cabinets, safes, or lockboxes. These individuals may also maintain their collections in password-protected or encrypted electronic media. They may keep these passwords, and other information concerning their use of the computer, on handwritten or printed notes that they store in personal areas and around the computer.

      e.     Possessors, traders and distributors of child pornography sometimes store their illegal images and videos online in remote storage accounts. Therefore, any records, documents, invoices and materials in any format or medium that concern online storage or other remote computer storage could indicate that a person at the **Subject Premises** is storing illegal material in an online storage account.

      f.     Files, logs, and records relating to P2P files can contain the names of files sent through the P2P service, as well as the date and time the files were transferred. These records could help identify the individual who transferred the child pornography images at

the **Subject Premises**. Additionally, these records can provide historical information about the trading of child pornography by individuals at the **Subject Premises**.

50.     Based upon the aforementioned common characteristics of child exploitation offenders and my training and experience, I know that an individual who has committed the **Subject Offenses** from a certain identified device, such as a cell phone, may maintain evidence of other violations of the **Subject Offenses** on the identified devices and others contained in their residence, vehicle, or on their person**.**

## SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

51.     Based upon my training and experience, and the training and experience of specially-trained personnel with whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

> a.     Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

26

b.      Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

52.      In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

53.      In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2251 through 2256, and are subject to seizure as such if they contain contraband or were used to obtain or store images of child pornography.

27

54. The warrant I am applying for would permit law enforcement to obtain from Heath DILLENBECK the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user

28

holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.      As discussed in this affidavit, based on my training and experience, I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been

29

unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than a certain number of hours have elapsed since the device was last unlocked or (2) when, within a certain number of hours, the device has not been unlocked using a fingerprint and the passcode or password has not been entered. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of Heath DILLENBECK to the fingerprint scanner of the device;[12] (2) hold the device in front of the face of Heath DILLENBECK and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## <u>Conclusion</u>

55.      Based on the forgoing, I respectfully submit that there is probable cause to believe that evidence of a crime, instrumentalities, and contraband relating to the **Subject Offenses**, as further described in Attachment B, will be found in the **Subject Premises**, **Subject Vehicle**, and/or

---

[12] Law enforcement will select the fingers to depress to the fingerprint scanner to avoid compelling the user of the device to disclose information about his or her knowledge of how to access the device.

on the person of **Heath DILLENBECK**, as further described in Attachment A. By affidavit and application, I request that this Court issue a search warrant for the apartment residence located at 74 Harvest Drive, Apartment 7307, Fond du Lac, Wisconsin, a black Chevrolet Traverse bearing New Jersey license plate G54-VSX, and the person of Heath DILLENBECK, more particularly described in Attachment A, authorizing the seizure of items described in Attachment B.

56.     The requested warrant also includes the authority to search the content of any electronic devices.

<u>**Attachment A**</u>
<u>**Property to be Searched**</u>

This warrant applies to the apartment residence located at 74 Harvest Drive, Apartment 7307, Fond du Lac, Wisconsin 54937 (the **"Subject Premises"**). The **Subject Premises** is located inside a multi-unit building bearing a sign that reads "74 Harvest Dr." The building has tan siding and brown brick façade. The building has multiple common doors. To the left of the common door leading to apartment 7307, there is a sign containing the numbers 7307, 7308, 7207, 7208, 7107, and 7108. The apartment door bears a number plate reading "7307" above a peep hole. This warrant also applies to a black Chevrolet Traverse bearing New Jersey license plate G54-VSX (the **"Subject Vehicle"**) and the person of Heath DILLENBECK, date of birth 05/03/2000. Pictures of the **Subject Premises** and **Subject Vehicle** are attached below.









**Attachment B**
**Particular Things to be Seized**

Evidence of a crime, instrumentalities, and contraband concerning production of child pornography in violation of 18 U.S.C. § 2251, and possession and receipt of child pornography offenses in violation of 18 U.S.C. §§ 2252 and 2252A (the "**Subject Offenses**") as follows:

1.      Documents in any format and medium pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8).

2.      Computers, tablets, removable media, electronic gaming devices, media players, computer hardware, computer software, and video display monitors that, based on their location, appearance, and/or other information learned at the time of the execution of the warrant are reasonably believed to be connected to the **Subject Offenses** or are in the possession of, used, or accessible by Heath DILLENBECK. This includes, but is not limited to, materials used to: visually depict child pornography as defined in 18 U.S.C. § 2256(8); display or access information pertaining to child pornography; display or access information pertaining to sexual activity with children; communicate with children; or advertise, distribute, possess, or receive child pornography, or otherwise access to transmit information pertaining to child pornography or other sexual activity with children.

3.      Phones that, based on their location, appearance, and/or other information learned at the time of the execution of the warrant are reasonably believed to be connected to the **Subject Offenses** or are in the possession of or used, currently or previously, by Heath DILLENBECK.

4.      Any passwords, encryption keys, and other devices that may be necessary to access any electronic equipment described above.

5.      Any items demonstrating the presence or absence of computer software that would allow others to control any electronic equipment, and the presence or absence of security software designed to detect such malicious software.

6.      Any items demonstrating the attachment of other computer hardware or storage media.

7.      Any counter-forensic programs and associated data that are designed to conceal or eliminate data.

8.      Any computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

9.      Items in any format and medium containing names, addresses, and/or other contact information of individuals who may have been contacted by individual(s) located at the **Subject Premises** (described in Attachment A) by use of the computer or by other means concerning the use of minors to engage in illegal sexual activity and the possession, receipt, or distribution child pornography, as defined in 18 U.S.C. § 2256(8).

10.     Any items in any format or medium of child pornography as defined in 18 U.S.C. § 2256(8); visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or of child erotica; of items pertaining to the enticement of minors to engage in illegal sexual activity; or of items evincing the **Subject Offenses** or otherwise relating to the sexual exploitation or abuse of children.

11. Any items identifying persons transmitting child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

12. Any items concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

13. Any items concerning membership in online groups, clubs, or services that make accessible child pornography to members.

14. Any items that concern any accounts with Internet Service Providers, including but not limited to sales receipts, bills, and notes.

15. Documents, in any format or medium, pertaining to occupancy of the **Subject Premises**, such as utility and telephone bills, mail envelopes, or addressed correspondence.

16. Any items in any format or medium of child pornography as defined in 18 U.S.C. § 2256(8), or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or of child erotica, or of items evincing the **Subject Offenses** or otherwise relating to the sexual exploitation or abuse of children.

17. Items in the above paragraphs that are stored in computer media, including media capable of being read by a computer (such as external and internal hard drives, memory sticks and thumb drives), and electronic devices such as computers, cellular phones, tablets, video display monitors, and other devices capable of storing digital images or accessing the internet, shall be searched. In executing this search warrant, law enforcement will seize computer media and electronic devices that, based on their location, appearance, and/or other information learned at the

time of the execution of the warrant, are reasonably believed by law enforcement to belong to or have been used by Heath DILLENBECK, or to otherwise be linked to the **Subject Offenses**.

During the execution of the search of the **Subject Premises** described in Attachment A, law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of Heath DILLENBECK to the fingerprint scanner of the device; or (2) hold a device found at the premises in front of the face of Heath DILLENBECK and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.